UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MINDY SIMON, wife of/and                    CIVIL ACTION
TROY LEPINE

v.                                          NO. 14-940

STATE FARM                                  SECTION "F"
FIRE AND CASUALTY COMPANY

ORDER AND REASONS

Before the Court is State Farm Fire and Casualty Company's motion for summary judgment.  For the reasons that follow, the motion is DENIED.

Background

This litigation arises from an insurance coverage dispute that pits the insured's claim (that over $250,000 worth of high end electronic devices were irreparably destroyed during a lightning storm) against the insurer's defense that the plaintiffs made material misrepresentations and submitted fabricated documents in support of their claim, thereby voiding the policy.

Mindy Simon, a homemaker, and Troy Lepine, a satellite TV installer, own a house located at 2746 Bayou Lours Court in Marrero, Louisiana, where they live with their two children.[1] On the evening of June 6, 2013 there were thunderstorms in Marrero.

_____

[1] The Lepine's reported income from their federal tax records from 2009 to 2012 is as follows: 2009: $42,761; 2010: $42,808; 2011: ($9,983); 2012: $59,414.

1

Mr. and Mrs. Lepine were watching television in the living room while their children were playing video games in the son's bedroom when they heard what "sounded like a bomb"; a bolt of lightning had struck their house.[2]  In addition to causing structural damage to their house, the electricity surge damaged personal property, including appliances and the family's extensive collection of electronic devices.

The next day, Mrs. Lepine contacted their homeowners insurer, State Farm Fire and Casualty Company, to report that the house had been struck by lightning.  At that time, the Lepine's house was insured under State Farm's homeowners insurance policy, which provided $259,000 in dwelling coverage and $194,250 in personal property coverage.  Lightning is a covered peril under the policy, which also provides:

>    2.    Concealment or Fraud
>
>          b.    We do not provide any coverages under this
>                policy for you or any other insured if you or
>                any other insured under this policy, whether
>                before or after the loss, has intentionally
>                concealed or misrepresented any material fact
>                or circumstance relating to this insurance.

Mrs. Lepine orally reported to State Farm that lightning struck their house and destroyed nearly all of the electrical systems and equipment in their house, including their air conditioning system,

---

[2]State Farm assumes for the purposes of the motion for summary judgment that lightning struck the Lepine's house.  Indeed, State Farm paid the Lepines $12,425 in benefits after the lightning strike.

their security system, and their appliances and media electronics. In particular, the Lepines claimed that they had several hundred thousand dollars worth of high-end electronics in their house at the time of the storm, which they claimed were destroyed and required replacement.

After receiving notice of the loss, State Farm opened a claim and initiated adjustment. On June 11, 2013, an independent adjuster, Albert Vaughan & Associates, inspected the Lepine's house. On August 23, 2013, Brian Ditta, a licensed electrician, inspected the Lepine house and inspected the electronics, outlets, switches, and the breaker panel; he issued a letter report and an invoice in the amount of $525.00.[3] Thereafter, State Farm tendered $12,435 in benefits to the Lepines for the damaged air conditioning unit and for a garage door.[4]  A total of $193,700 of coverage

---

[3]Mr. Ditta's letter lists items that he checked, which he found would not "power up".  The Ditta letter does not indicate whether the items that would not power up could be repaired, or whether they were destroyed. Nor does the Ditta letter opine as to the value of the items he inspected.  In fact, the Ditta letter directed the Lepines to  "Refer to Audio Video Company" for many of the listed items.
The Lepines underscore that Mr. Ditta stated in an affidavit:

> While in the Lepine home, I observed a large volume of electronics, including x-boxes in each room, a television in each room, three to four computers, a printer, a scanner, a big screen projector, a surround sound system and security equipment.

[4]Of this amount, $11,910 was tendered under Coverage A - dwelling.  The remaining $525 was tendered under Coverage B –

remained available under the Lepine's personal property coverage.[5]

After being notified of the claim, State Farm repeatedly advised the Lepines that they needed to prepare a personal property inventory form (PPIF), a standard proof of loss requirement that documents the damaged items and lists the age and value of each. A few months later, the Lepines complied;[6] they submitted the PPIF to State Farm on September 18, 2013 as part of their proof of loss. A snapshot of the Lepine's 22-page PPIF:

| Room | Total Value Per Room | Non-Electronics |
|------|---------------------|-----------------|
| 1.  Foyer | $315.98 | $15.98 |
| 2.  Hall Bathroom | $115.98 | $115.98 |
| 3.  Home Office | $15,195.92 | |
| 4.  Master Bedroom | $4,519.74 | |
| 5.  Master Bath | $1,089.98 | |
| 6.  Master Closet | $107,859.98 | |
| 7.  Daughter's Room | $5,540.47 | |
| 8.  Son's Room | $7,220.39 | |
| 9.  Family Room | $30,407.92 | $2,999.99 |
| 10. Kitchen | $1,049.47 | $549.38 |
| 11. Laundry Room | $605.99 | $596.00 |

---

personal property.

   [5]But no additional benefits under the policy were paid to the Lepines.  Rather, State Farm's adjustment of the claim revealed "significant anomalies in the Lepine's claim"; after undertaking an investigation, State Farm ultimately cancelled the Lepine's policy.

   [6]State Farm contends that it took the Lepines four months to submit the PPIF.  The Lepines suggest that compiling a PPIF took time, given their extensive collection of electronics.

4

| 12. Theater Room | $73,228.77 | |
| 13. Game Room | $14,251.88 | |
| 14. Garage | $1,193.74 | $543.74 |
| 15. Side Yard | $750.00 | |
| 16. Patio | $800.00 | |
| Total | $264,146.21 | $4,821.07 |

Thus, according to the PPIF, the Lepines had $264,000 in damaged personal property; of that amount, approximately $260,000 worth was home electronics. Accompanying the PPIF, the Lepines also submitted receipts purporting to show purchase history and price. Based on the receipts submitted in support of their PPIF, the majority of electronics were purchased from two companies, Bayou Audio Sales and Diversified Security Systems, totaling $272,305.78 in a six month time frame summarized in part as follows:

| November 1, 2010 | Diversified Security | $65,739.38 |
| November 26, 2010 | Diversified Security | $27,194.17 |
| January 2, 2011 | Bayou Audio Sales | $49,807.47 |
| March 21, 2011 | Diversified Security | $33,875.63 |
| April 8, 2011 | Diversified Security | $70,383.00 |
| May 13, 2011 | Diversified Security | $25,306.13 |

Also in support of their proof of claim, the Lepines submitted a damage assessment purportedly prepared by Bayou Audio. The report concluded that "All of this system damage was due to a massive energization – most likely a lightning strike!!!" According to the

Bayou Audio report, on July 26, 2013, Bayou Audio technicians spent 14 hours assessing the home electronics and charged $1,310.00 for the inspection.  The technicians documented 93 items, but did not suggest whether these items were repairable or needed to be replaced.  The report also failed to assign any value for any of the listed items.

State Farm attempted to contact Bayou Audio to determine repair or replacement value of the listed items.  But when State Farm attempted to contact Bayou Audio and Diversified Security at the telephone numbers and addresses listed on the receipts, neither number worked and neither company was (or had been) located at the listed addresses.[7]  State Farm investigated further.  But Google searching the companies' names, telephone numbers, or addresses failed to turn up a hit on either company.  Neither the Louisiana Secretary of State nor the Louisiana Department of Revenue nor the Jefferson Parish Sheriff's Office, Bureau of Revenue and Taxation has any records, filings, or other papers regarding either company. The Bureau's director confirmed that the address listed for Bayou

---

[7]The receipts show:
Bayou Audio Sales and Service
2601 Barataria Blvd.
Marrerro, LA 70072
504-328-7512

Diversified Security Systems
2001 Williams Boulevard
Kenner, LA 70056
985-773-9989

Audio is presently the location of a Family Dollar store, which has operated there since 2005 and that the address listed for Diversified Security is presently the location of a restaurant called La Azteca, which has operated there since 2008.  State Farm informed the Lepines that it could not reach Bayou Audio; Mrs. Lepine told State Farm that she attempted to reach Bayou Audio as well but was unable to do so.

On October 9, 2013 the Lepines then submitted a new damage evaluation report, this one purportedly prepared by a company called DTS  The DTS report indicated that technicians came to the Lepine's house, inspected all of their electronics, and found that they "malfunctioned".[8]  To replace the destroyed electronics, the DTS report estimated, would cost more than $258,370.50.  This was the first report that provided a value estimate on replacing the damaged electronics.  When State Farm contacted DTS, the owner advised that the owner's technician, Josh Ducros, prepared the report.  Later, DTS's owner contacted State Farm and explained that Ducros admitted to him that he never went to the Lepine's house, nor did he inspect anything (nor did anyone from DTS).  Ducros

---

[8]In particular, the report stated:

> While on premise technicians observed the following equipment to be malfunctioned from what appears to be a massive lightning strike. This quote will be used as an estimate to replace all equipment and install the camera system and alarm.  All other equipment will be based on an hourly wage for install.

himself called State Farm and admitted the same; he told State Farm that Mr. Lepine gave him a list of what was allegedly damaged and that he (Mr. Ducros) wrote what Mr. Lepine asked him to write in the report.

After learning this, State Farm contacted the Lepines and informed them of its investigation into the DTS report.   The Lepines consented to an inspection of the electronics by State Farm, which occurred on October 26, 2013.[9]  However, the inspection did not resolve any outstanding issues because Mr. Lepine had previously discarded most of the electronics in a "construction dumpster" near his house.[10]

The circumstances surrounding the Lepine's claim for personal property damage prompted State Farm to schedule the Lepines for examinations under oath in December 2013.[11]  State Farm questioned

---

[9]The Lepines submit that they had begged State Farm to inspect their electronics collection previously during the course of State Farm's adjustment of their claim.

[10]During his examination under oath, Mr. Lepine stated that he threw away most of the damaged equipment about "five weeks after we sent the list in and talked to the reps" because:

> A lot of it is discarded because we had a big pile in the back next to the pool table and the kids were playing on it.  We got one of the iPads that was smashed because my son being ADHD, he's kind of all over the place. I have – my daughter hurt her leg climbing on some of the stuff to get to other things.

[11]In connection with the insureds' duties after a loss, the insurance contract provides, among other duties such as preparing an inventory of damaged property substantiated by

the Lepines regarding the documents submitted with their proof of loss and probed for independent confirmation of (what State Farm considers to be) their extravagant electronics purchases (including a receipt dated November 1, 2010 from Diversified Security for a $65,739.38 purchase and one dated April 8, 2011 showing a $70,383.00 purchase). To no avail. Mr. Lepine explained during his examination under oath that he did not have any cancelled checks or credit card statements confirming the purchases because he had purchased the entire collection of home electronics with cash. Nor was there any bank statement to corroborate withdrawals of cash for the purchases; rather, Mr. Lepine stated that, over the years, he had saved over $200,000 in cash that he kept in a safe in his house. Because neither State Farm nor the Lepines have been able to contact Diversified Systems or Bayou Audio, the company receipts and statements made by Mr. Lepine during his examination under oath that he bought most of his home electronics from these two companies is the only evidence that either company ever existed.[12]

State Farm also asked the Lepines during their examinations under oath about the circumstances leading up to the creation of

---

receipts and related documents, that the insured must "as often as we reasonably require...submit to...examinations under oath...."

[12]As for Diversified Systems, Mr. Lepine stated that he never went to the storefront, but that he researched online the items he ordered from Diversified. As for Bayou Audio, Mr. Lepine stated that "I met them at lunch at Jake's" and, later, after they inspected the damage and gave him the report, he could not find them.

the DTS report.  Mr. Lepine explained that the DTS report was prepared by a former colleague, Josh Ducros.  Mr. Lepine said that Mr. Ducros was supposed to come to his house to inspect the damaged security equipment but that their schedules conflicted.  On Mr. Ducros' invitation, Mr. Lepine went to Mr. Ducros' house and gave him a copy of the Bayou Audio damage assessment report, which Mr. Ducros essentially copied and emailed to Mr. Lepine.

Mr. Lepine emphasized that Mr. Ducros was supposed to come to his house to inspect the damage but he never did.  Mr. Lepine further explained that he is "bad with" email and that he did not realize that Ducros had emailed him the DTS report; rather, his wife, who often checks his email, saw the report and, without discussing it with Mr. Lepine, emailed it to State Farm.  According to Mr. Lepine, it was only after Mr. Ducros called him a few days later, complaining that he (Mr. Lepine) had gotten his friend company (DTS) in trouble, that Mr. Lepine claims he realized that Mr. Ducros had emailed him the report and that his wife had forwarded it to State Farm.

Mr. Lepine continued his explanation, under oath.  He testified that he told Mr. Ducros that his damage estimate was wrong, but that Mr. Ducros was not willing to take the time to correct it.  Mr. Lepine stated that he asked Mr. Ducros why he (Mr. Ducros) falsely reported that technicians came to the house and inspected the electronics.  Mr. Lepine also stated that, when they

10

first met, Mr. Ducros told him that he (Mr. Ducros) wanted to "screw the insurance company", but that Mr. Lepine responded that he (Mr. Lepine) was not interested in screwing the insurance company, only in getting the replacement value for his damaged personal property.  Mrs. Lepine corroborated her husband's version of the story; it was she that submitted the DTS report to State Farm.

Mr. Lepine revealed during his examination under oath that he had exchanged text messages with Mr. Ducros concerning the DTS report.   The text messages between Mr. Lepine and Mr. Ducros concerning the DTS report:

- Mr. Lepine asked for Mr. Ducros' "help with this insurance mess";
- Mr. Ducros texted Mr. Lepine his (Mr. Ducros') email address, stating "Give me a list of everything you need with prices and I will get a bill made."
- Mr. Lepine planned to visit Mr. Ducros at Mr. Ducros' house, and did visit him, on September 27, 2013, at which time he gave Mr. Ducros the Bayou Audio report.
- Mr. Lepine continued to text Mr. Ducros to check on the status of the report he was preparing and he asked when it would be completed.
- Mr. Ducros asked Mr. Lepine questions about some of the items on the Bayou Audio report and Mr. Lepine sent Mr. Ducros screen shots of internet pricing information for certain items.
- On October 3, 2013 Mr. Ducros asked for Mr. Lepine's email; Mr. Lepine told Mr. Ducros to match the same contact information (his wife's name and phone number).
- That same day, Mr. Ducros asked Mr. Lepine if he had received the DTS report he emailed.  Mr. Lepine confirmed "[i]t just came through."
- Mr. Lepine texted Mr. Ducros that he would look over the report "with in the hour", to which Mr. Ducros responded that he would not be able to make any changes until "tomorrow."
- Later that evening and over the next several days, Mr. Lepine tried to follow up with Mr. Ducros, asking him if he had time

11

to talk, sending Mr. Dcuros screen shots of internet pricing for electronic equipment, and stating "Did you type this from your house or the shop? Because I am not familiar enough to do what we talked about and she's not gonna be around lol".

- Finally, after hearing no response from Mr. Ducros, on October 7, 2013 Mr. Lepine texted "Sorry I feel like a pest so I just wanna let you know that I'm gonna submit it as is.  I don't wanna cause any stress.  I apreciate (sic) the help, I'm just ready for all of this to be over!"
- [The DTS report was emailed to State Farm from Mrs. Lepine's email address on October 9, 2013.]
- After Mr. Ducros inquired "How's it going with the insurance company" on October 11, 2013, Mr. Lepine asked Mr. Ducros "No clue yet lol.... Did they call you?"
- On October 14, 2013, Mr. Lepine texted Mr. Ducros "Let me know if they call you, I'm about to stir the pot. We paid cash", to which Mr. Ducros inquired, "What you mean you paid cash". Mr. Lepine responded, "You rather me say something else? For the assessment, the 12 hours to text everything.... They should be calling you today they need to verify items are damaged and on repairable".  Mr. Ducros replied, "No thats (sic) fine."
- That same afternoon, Mr. Ducros texted Mr. Lepine, "Dude they know the other 2 businesses don't exist. If you don't have the stuff you threw away there is nothing we can do with that. You got my boy's business in a tight spot right now." Mr. Lepine responded:

  As far as the other 2 companies not existing I had no idea but how do I have you friends company in a tight spot,  y'all  know  that  I'm  not  buying  anything  from y'all....
  I just wanna make sure that you know that I have proof that we have pictures of the few pieces of equipment I had tossed.  I know no to get rid of anything else until this is over. I never been through any of this before, I sorry wasting your time.

State Farm first discovered these text messages during Mr. Lepine's examination under oath on December 18, 2013.  Thereafter, Josh Ducros submitted to an examination under oath on January 22, 2014, at which time he testified that there was never a plan for him to go to the Lepine's house to inspect any electronics; rather, Mr. Lepine told him to use the Bayou Audio report to prepare a similar

12

report.[13]  Mr. Ducros also confirmed that Mr. Lepine asked him to change the report to increase the replacement values on some items; that Mr. Lepine told him he was going to submit the DTS report as is; that Mr. Lepine told him that, when State Farm called, he should tell State Farm that he inspected the electronics, which were damaged and non-repairable.

On March 6, 2014 the Lepines sued State Farm in state court, alleging breach of contract and breach of duty of good faith and fair dealing; they seek to recover the $193,700 remaining under their policy in personal property coverage, as well as statutory penalties and attorney's fees.  On March 28, 2014, State Farm sent a Notice of Cancellation to the Lepines, declaring their insurance policy void as of the date of the lightning strike, June 6, 2013. State Farm removed the lawsuit, invoking this Court's diversity jurisdiction.[14]   State Farm now seeks summary relief on its affirmative defense that Mr. Lepine's material misrepresentations voided the insurance policy.

I.

Federal Rule of Civil Procedure 56 instructs that summary

---

[13]Counsel for plaintiff takes issue with the fact that she was not present for Mr. Ducros' examination under oath.

[14]On July 9, 2014 the Lepines filed a first amended complaint, in which they allege, in addition to breach of contract, "negligent and intentional infliction of emotional distress and the cost of the higher premium for new insurance resulting from [the] illegal cancellation [of the State Farm policy]."

judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v.

<u>John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.

II.

*A.*

At issue is whether State Farm, invoking the material misrepresentation provision of the insurance contract, has carried its burden on its affirmative defense and is therefore entitled to judgment as a matter of law.[15]  State Farm contends that the record shows that the plaintiffs presented State Farm with false, fabricated documents in an attempt to inflate their proof of loss; that, when confronted about the fabricated receipts and reports during their examinations under oath, the plaintiffs testified dishonestly concerning the circumstances surrounding their submission of the fabricated documents. These facts, State Farm submits, trigger the material misrepresentation clause, voiding the insurance policy.  The plaintiffs counter that the plaintiffs had no intent to defraud State Farm, the inconsistency between Mr. Ducros and Mr. Lepine's testimony is a question of fact precluding summary judgment, any alleged misrepresentation regarding the DTS estimate is immaterial to their claim, and that State Farm is

---

[15]What is not presently in dispute: whether lightning struck the plaintiffs' house, causing covered damage; whether the plaintiffs possessed valuable electronics that were damaged.

contractually obligated to pay the policy limits of their contents coverage claim, which is an amount less than their actual loss. Simply put, the plaintiffs submit that State Farm wants to avoid paying the plaintiffs' claim.

*B.*

Louisiana recognizes and enforces misrepresentation clauses such as the one in the Lepine's State Farm policy.  See, e.g., Mamco, Inc. v. American Employers Ins. Co., 736 F.2d 187, 189-90 (5th Cir. 1984)(Wisdom, J.)(applying Louisiana law).  When an insurer invokes the material misrepresentation clause of its policy as an affirmative defense to liability, the insurer bears the burden of proving that the insured violated the policy provision. See Cousin v. Page, 372 So.2d 1231, 1233 (La. 1979); see also Roach v. Allstate Indemnity Co., No. 09-1110, 2011 WL 4402575, at *2 (M.D.La. Sept. 20, 2011)(Vance, J.).

To succeed on its affirmative defense to avoid coverage under a policy, the insurer must prove three elements: (1) the insured made false statements; (2) the false statements were made with the actual intent to deceive; and (3) the misstatements materially affected the risk assumed by the insurer. See Cousin, 372 So.2d at 1233; see also Darby v. Safeco Ins. Co. of America, 545 So.2d 1022, (La. 1989); see also Dean v. State Farm Mut. Auto. Ins. Co., 975 So.2d 126, 132 (La. App. 4 Cir. 2008).

State Farm submits that the Lepines made false statements when

they submitted the fabricated DTS report as proof of their claim, that they then misrepresented the circumstances of how and why the report was submitted to State Farm during their examinations under oath, and that the text messages between Mr. Lepine and Mr. Ducros reveal that the DTS report was fabricated with the intent to deceive State Farm.  The record supports State Farm's submission on false statements and intent.

As to the first element of its affirmative defense, the record confirms that State Farm has carried its burden in proving that the Lepines made false statements to State Farm in support of their claim.  There is no genuine dispute regarding the fact that Mr. Lepine gave Mr. Ducros an extensive list of electronics (by way of a prior report from a company that indisputably vanished without a trace) and supplied some pricing information so that Mr. Ducros would generate a report purporting to independently estimate the value of the electronics so that Mr. Lepine could give the report to State Farm in support of his insurance claim.  Nor is there any dispute that Mr. Ducros never went to the Lepine house for the purposes of independently investigating the status of the list of items Mr. Lepine supplied to him.  Moreover, there is no dispute that, whether or not Mrs. Lepine ultimately emailed the report to State Farm, Mr. Lepine knew that he had received, in his email inbox, the DTS report; the record reveals that Mr. Lepine texted Mr. Ducros that he would be submitting it to State Farm "as is."

17

And the Lepines indeed submitted the DTS report to State Farm "as is" shortly after Mr. Ducros emailed it to Mr. Lepine.[16]  Mr. Lepine told Mr. Ducros that, if State Farm asked, he was to say that Mr. Lepine paid him cash "[f]or the assessment[,] for the 12 hours to test everything" even though Mr. Ducros in fact never went to Mr. Lepine's house to inspect the electronics.

The plaintiffs submit nothing to controvert the evidence showing that the DTS report, insofar as it purported to be an assessment/estimate from the company DTS, was a fabricated document that the Lepines submitted to State Farm in support of their claim.[17]  The Court finds, as a matter of law, that State Farm has proved the first element of its affirmative defense: the Lepines made false statements in support of their insurance claim.[18]

---

[16]The Lepine's email transmitting the DTS report stated "Attached is the Assessment/Estimate from D.T.S. on the security system and electronics."

[17]They suggest, limply, that the DTS report was "only an estimate" and the text messages and examinations under oath reveal nothing more than a misunderstanding.

[18]Mrs. Lepine's own testimony fails to raise a fact issue as to State Farm's position that the DTS report is a false statement submitted to State Farm: even Mrs. Lepine suggested under oath that she would not have submitted the report if she had known that there had been no home assessment. Even if the Court indulges Mrs. Lepine's testimony that she sent the DTS estimate after finding it in her husband's email and that she did not discuss it with her husband before she sent it, this does not change the fact that the fabricated report was sent to State Farm and that the record shows that Mr. Lepine knew he had received report and also knew that State Farm had received the report and he told Mr. Ducros (after telling him "I'm going to stir the pot") to lie to State Farm by telling them that Mr. Lepine paid him cash for the

These same record facts also point toward intent.  But proving intent on a paper record is trickier.  Mindful that "a party's state of mind is inherently a question of fact which turns on credibility," this Court "must be vigilant to draw every reasonable inference from the evidence in the record in a light most flattering to the nonmoving party."  See International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265 (5th Cir. 1991).  It is "[b]ecause of the difficulties inherent in proving that a person acted with the intent to deceive," that the Louisiana Supreme Court has observed that "courts have lightened somewhat the insurer's burden by considering the surrounding circumstances in determining whether the insured knew that representations made to the insurer were false":

> Intent to deceive must be determined from surrounding circumstances indicating the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality.

See Darby, 545 So.2d at 1026 (quoting Cousin, 372 So.2d at 1233).

State Farm submits that the plaintiffs testified dishonestly regarding the DTS report and that the text messages are smoking gun evidence of the plaintiffs' intent to deceive.  The plaintiffs deny that they had any intent to deceive State Farm and submit that fact

---

assessment and that his assessment revealed that the electronics were not capable of being repaired.

issues respecting intent preclude summary judgment.  The Court finds that there is no *genuine* dispute as to whether Mr. Lepine intended to pass off the DTS report as an independent assessment or estimate in support of his insurance claim.[19]  The text messages between him and Ducros confirm, in real time, that Mr. Lepine knew when he had received the DTS report; they also show that he attempted to send more pricing information to Ducros so that he would change the report to reflect internet screen shot pricing of certain electronic devices; and that Mr. Lepine told Mr. Ducros to tell State Farm that Mr. Lepine paid Mr. Ducros cash for "the assessment, the 12 hours to test everything" (even though it is undisputed that Ducros never performed an assessment); Mr. Lepine also told Ducros to "verify [that] items are damaged and non repairable" even though Mr. Ducros had no independent knowledge of that fact.[20]  Although the Court is forbidden from both weighing the

---

[19]The plaintiffs attempt to frame the intent element as a credibility dispute. But the Court need not resort to credibility determinations (and, thus, defer to the fact finder at trial) where, as here, there is uncontroverted evidence in support of State Farm's defense, which also establishes that Mr. Lepine lied under oath.

[20]That Mr. Lepine testified, falsely, in his examination under oath does not change what the text messages establish.  Mr. Lepine testified that he did not know that Ducros emailed him the report; he did not review the report; he did not submit the report to State Farm; he had no idea his wife had sent it; and he was waiting for Mr. Ducros to come by the house to do the post-report assessment.  The text messages, ironically discovered during his examination under oath, belie Mr. Lepine's testimony.  The text messages show that: Mr. Lepine told Mr. Ducros to lie about whether he came to the house to do an assessment (and about the non-

evidence and making credibility determinations on summary judgment, the Court finds that State Farm has carried its burden in showing that -- whether Mr. Lepine technically submitted the report to State Farm or whether Mrs. Lepine did -- Mr. Lepine knew that the DTS report that had been submitted to State Farm was fabricated and he nevertheless intended to pass off the report as a true assessment or estimate of his damaged electronics.[21]  There is no genuine issue of material fact concerning Mr. Lepine's intent to deceive State Farm in passing off an "assessment/estimate" that estimated the replacement value for his electronics at over $250,000.

Turning to the final element, materiality: when the misrepresentation concerns the value of an insured's loss, "'materiality' simply embodies the understanding that the misrepresentation concerns a fact that significantly affects the rights or obligations of the insurer." Bennett v. Allstate Ins. Co., 950 F.2d 1102, 1106 (5th Cir. 1992)(citing Mamco, Inc. v. Am.

---

repairability of his electronic equipment, which Mr. Ducros never observed); Mr. Lepine knowingly supplied Ducros with the value of allegedly inspected items; Mr. Lepine knowingly passed of the DTS report as a genuine assessment by an independent third-party company in support of his insurance claim.

[21]Although the plaintiff points to Mrs. Lepine's testimony that she sent the DTS report to State Farm, that fact (whether or not true and credible) is not material given that Mr. Lepine knew that State Farm had the DTS report, which was created by Ducros at Mr. Lepine's insistent and with Mr. Lepine's input only, and not after an independent assessment.

Emp'rs Ins. Co., 736 F.2d 187, 190 n.6 (5th Cir. 1984)).

State Farm does not dispute that the Lepines had more electronics than the average family, but urges the Court to consider the surrounding circumstances in the record that show that the Lepines grossly inflated their insurance claim and prove that the misstatements in the DTS report materially affected the risk assumed by State Farm.

The surrounding circumstances create a reasonable assumption that the insured recognized the materiality of the DTS report. The only support for the Lepines claim, in which they contend that they paid cash for hundreds of dollars worth of electronics that were damaged by lightning include: the Lepine's testimony and receipts from companies that have either vanished or never existed.  Any other evidence that might corroborate the dollar amount of their claim is tainted: the DTS report, which was compiled from the Bayou Audio report and not based on an independent assessment; the inspection by State Farm failed to corroborate the purportedly high value of the plaintiffs' claim because the electronics had been thrown away.[22]

However, for State Farm to be entitled to judgment as a matter of law on materiality, there needs to be some evidence in the

---

[22]The plaintiffs also submit photos, presumably of their electronics, as well as affidavits from people that have visited their house, who presume to attest to their "extensive system of electronics" and attest to certain specific electronics viewed while in the Lepine's house.

record concerning the value of the Lepine's claim. There is certainly evidence in the record that would support a finding that Mr. Lepine assisted in fabricating the DTS report (by using much of the information from the suspicious Bayou Audio report) so that he could deliberately misrepresent the value of his loss. Presumably by inflating it. However, the Court would have to conclude that no factual controversies remain concerning the value of the Lepine's claim; that the Lepines are simply lying about their alleged purchases from Bayou Audio and Diversified Systems. But both sides have submitted evidence of contradictory facts on this issue. Thus, a genuine dispute persists concerning whether the Lepines had approximately $250,000 worth of electronics, or whether they "only" had $44,000 worth of electronics,[23] yet tried to recover more than their actual loss. It will be up to the fact-finder to determine whether or not the Diversified Security and Bayou Audio receipts were fabricated, or were in fact receipts (from companies that never legally operated or had a storefront) that were given to Mr. Lepine for items he purchased from companies that simply vanished.[24]

---

[23]Including the alleged purchases from Bayou Audio and Diversified Systems, the plaintiffs supposedly had over $250,000 worth of electronics. It is for the jury to disbelieve (or not) the Lepine's story that they had saved over $200,000 in cash and purchased, in cash, all those electronics from companies that never had a storefront and simply vanished. All with the income reflected in their tax returns.

[24]Although possibly unworthy of belief, Mr. Lepine submits that the companies existed. It will be for the jury to evaluate all of the evidence, including Mr. Lepine's testimony concerning

Because factual controversies remain concerning the materiality of the DTS report  -- fact issues that cannot be resolved except by resort to credibility determinations and weighing the evidence -- State Farm's motion for summary judgment is DENIED.

New Orleans, Louisiana, November 6, 2014

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

how or why he bought so much electronic equipment from two
companies in such a short period of time without ever visiting the
companies' store fronts; and how he saved so much cash over the
years (and why he spent all of it on depreciable electronic
equipment).  In light of the suspicious circumstances surrounding
this case and the fact that some of Mr. Lepine's testimony has been
proven to be false, the Court might well be obliged to refer this
matter to the proper authorities depending on the result of the
trial.